# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| ASHLEY E. BROWN, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     v. | )    **CAUSE NO. 1:10-CV-00450** |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Ashley E. Brown appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  Brown filed an opening brief on June 2, 2011, and the Commissioner responded on September 12, 2011. (Docket # 17, 23.) Brown, however, failed to file a reply brief, and the time to do so has since passed.  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

On October 26, 2006, Brown filed an application for SSI, alleging disability from April 1, 2000.  (Tr. 17.)  Her claim was denied initially and upon reconsideration, and Brown requested an administrative hearing.  (Tr. 17.)  On March 4, 2009, Brown filed an application for DIB, alleging disability since January 1, 2007, her date first insured.  (Tr. 17, 89-97.)

---

[1]All parties have consented to the Magistrate Judge.  *See* 28 U.S.C. § 636(c).

Administrative Law Judge ("ALJ") Bryan J. Bernstein conducted a hearing on August, 6, 2009, at which Brown, who was represented by counsel, Brown's grandmother, and a vocational expert ("VE") testified. (Tr. 17, 625-55.)

On April 23, 2010, the ALJ rendered an unfavorable decision to Brown, concluding that she was not disabled because she failed to establish that she did not engage in substantial gainful activity (SGA) since the date her SSI application was filed and because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (Tr. 17-28.) The Appeals Council denied Brown's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-5, 597-622.)

Brown filed a complaint with this Court on December 17, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.) She raises the following three arguments in her appeal: that the ALJ improperly evaluated (1) the opinion of her treating physician, Dr. Peter Jakacki; (2) Brown's symptom testimony; and (3) the SGA issue. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 11-16.)

## II.  FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Brown was twenty-two years old (Tr. 14, 26-28, 91), had a high school education (Tr. 627), and had previously worked as a cashier and waitress (Tr. 100, 635-36). Brown alleges that she became disabled as of April 1, 2000, for SSI purposes, and as of January 1, 2007, for DIB purposes, due to Gitelman's Syndrome, major depression, and borderline personality disorder. (Opening Br. 1-2.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 655-page administrative record necessary to the decision.

### B. Brown's Testimony at the Hearing

At the hearing, Brown testified that she suffered from Gitelman's Syndrome, a genetic kidney disease that causes low potassium and magnesium levels. (Tr. 629-32.) Brown reported that Dr. Peter Jakacki, her treating physician, would send her to the hospital periodically to get her potassium and magnesium levels checked and, if they were low, to get an infusion, which could last anywhere from three to eight hours. (Tr. 632.) Because of her Gitelman's Syndrome, Brown stated that she had to take fifty pills of potassium and twenty pills of magnesium each day, along with injecting magnesium in her leg daily and receiving vitamin B injections three times a week to increase her energy level. (Tr. 632-34, 643-44.) Brown further indicated that she took Ambien to help her sleep, a water pill to hold potassium in, and Phenergan to help with her nausea. (Tr. 634.) Brown also stated that she had depression, for which she took Celexa. (Tr. 634.) In total, Brown estimated that she took eighty-six pills per day. (Tr. 644.) As for side effects, Brown testified that her medications often made her nauseous and caused vomiting (Tr. 646) and that she took Immodium every morning to prevent the magnesium from acting as a laxative (Tr. 633, 643). Brown also reported urinary frequency, requiring her to use the restroom every twenty to thirty minutes and an average of six times during the night, headaches three to four times a week, and constant neck pain and knots. (Tr. 633, 643-44.) Brown also indicated that she took a one to two hour nap each day due to lack of energy. (Tr. 643.)

Brown previously worked at Texas Roadhouse for three to four months and Buffalo Wild Wings for a year. (Tr. 635-46.) She testified that she worked four nights a week, from about five o'clock to eleven or twelve o'clock at night and that she last worked in January 2008. (Tr. 636.) Brown has not applied for any other work since she left Buffalo Wild Wings. (Tr. 636.)

As for her employment limitations, Brown stated that she could not sit or stand a lot, would need frequent bathroom breaks every twenty to thirty minutes, had to be able to leave work if her levels were low, and needed to work a night shift because her symptoms were worse in the morning. (Tr. 636-37; 646.)

Brown testified that she lived on her own with her almost one-year-old daughter and was currently pregnant. (Tr. 638.) She reported that she got help from her daughter's father, but was able to clean the home and take care of her daughter. (Tr. 639.) Brown also stated that she was currently taking three online college courses. (Tr. 628.)

### C. Other Witness Testimony

Brown's grandmother also testified at the hearing, stating that Brown understated her pain and symptoms (Tr. 648) and that Dr. Jakacki had taken a special interest in her (Tr. 647). According to Brown's grandmother, Brown was able to work previously because she was good with people and her employers would give her bathroom breaks, allow her to leave early if she did not feel well, and gave her a stool to sit on. (Tr. 648-50.) The grandmother also testified that Brown could not walk very far—a block or two—without needing to rest, could hardly stand, and could not sit for very long. (Tr. 649-50.) She further indicated that she helped Brown take care of her daughter, as did Brown's aunt, the baby's father, and the father's family. (Tr. 650.)

### D. Testimony of the Vocational Expert

An impartial VE also testified at the hearing. The ALJ posited to the VE a hypothetical of a person who "would not be able to perform work that imposes close regimentation of production," required hourly restroom breaks, lasting three to five minutes each, had to be able to sit or stand while working, could not stand or walk longer than seventy-five percent of an

eight hour workday or for prolonged periods lasting more than a half hour, and could lift and carry as much as twenty pounds occasionally and ten pounds frequently. (Tr. 651-52.) While the VE stated someone with this profile could not perform Brown's past work, he further testified such an individual could perform other light exertion jobs such as a laundry folder, mail clerk, and collator operator. (Tr. 652.) The VE indicated that, if Brown missed more than four working days a month, none of these jobs would be available. (Tr. 654.)

### E. Summary of the Relevant Medical Evidence

#### 1. Dr. Peter A. Jakacki's Medical Source Opinions

Dr. Peter A. Jakacki, Brown's primary care physician since early 2005,[3] wrote two relevant letters concerning Brown's condition. (Tr. 231-33, 227-30.) In the January 30, 2008, letter, Dr. Jakacki indicated that he had seen Brown regularly since February 2005 and reported that she suffered from Gitelman's Syndrome, a genetic renal tubular defect in which the kidney wastes an excessive amount of potassium and magnesium resulting in chronic severe and recurrent episodes of hypokalemia (low potassium) and hypomagnesemia (low magnesium). (Tr. 231.) He opined that Brown "would need to intermittently be hospitalized for prolonged IV potassium and magnesium if intermittent emergency room visits to get IV potassium and magnesium did not suffice." (Tr. 231.) He also reported that Brown had, among other ailments, severe migraine headaches, knots in her neck and shoulders, and urinary urgency, all of which he linked to her Gitelman's Syndrome. (Tr. 231-32.) Dr. Jakacki stated that Brown had become depressed due to her physical health, which aggravated her condition. (Tr. 233.) He then noted that her impairments were lifelong as Gitelman's Syndrome is a genetic disease. (Tr. 233.)

---

[3]Either January or February of 2005. (*Compare* Tr. 152, *with* Tr. 231.)

In regards to work, Dr. Jakacki reported that Brown's workplace had accommodated her in the past by allowing her to sit behind the counter when she could not stand, leave frequently for bathroom breaks, work evenings due to severe morning headaches, and sometimes miss work due to emergency room visits or hospital stays.  (Tr. 233.)

According to Dr. Jakacki's June 9, 2009, letter, Brown suffers from an array of chronic medical problems with life-threatening implications, the most severe of which is Gitelman's Syndrome.  (Tr. 227.)  Dr. Jakacki further reported that Brown has to take tremendously high doses of potassium and magnesium at least four to five times a day, totaling approximately fifty capsules of potassium and twenty or more pills of magnesium throughout the course of the day.  (Tr. 227.)  Dr. Jakacki stated that "the magnesium causes severe watery diarrhea and fecal urgency," requiring Brown to rush to the bathroom and making it difficult for her to maintain her magnesium levels even when she takes it appropriately dispensed throughout the day.  (Tr. 227, 229.)  Because of the diarrhea, Brown will lose further potassium and magnesium, causing unexplained drops in her levels and oftentimes resulting in emergency room visits as these drops frequently occur when the doctor's office is closed.  (Tr. 229.)  While the mere taking of excessive high doses of potassium and magnesium will put her in a steady state, Dr. Jakacki opined that, even when she takes these very high doses, she is still maintained at a low, but not so dangerously low, level.  (Tr. 229.)

Furthermore, Dr. Jakacki noted that Brown's symptoms are exacerbated by pregnancy; during her pregnancy with her first child, Dr. Jakacki reported that Brown required an average of two hospital visits per week for repeated IV potassium and magnesium infusions and sometimes follow-up hospitalizations when her levels became dangerously low.  (Tr. 228.)  As of the

writing of Dr. Jakacki's letter, Brown was in the beginning of a second pregnancy. (Tr. 229.)

Besides Gitelman's Syndrome, Dr. Jakacki reiterated that Brown developed major depression with anxiety due, in great part, to the stress imposed by her medical conditions, which required treatment with antidepressants. (Tr. 228.) Moreover, Dr. Jakacki stated that Brown had severe migraine headaches exacerbated by chronic muscle tension, chronic neck problems, electrolytic disturbances, hormonal fluctuations, and stress and that she suffered from interstitial cystitis, which causes her to urinate frequently and is aggravated by her potassium doses, increasing the frequency and urgency of her urination and causing her to wake up more often at night. (Tr. 229.) Dr. Jakacki further noted Brown's chronic neck and back problems, for which she has gotten injections in the past. (Tr. 230.) Brown could not follow through on a further referral for injections because of her pregnancy. (Tr. 230.)

In his June 9, 2009, letter, Dr. Jakacki also stated that he had cared for Brown as her treating physician over the last four years and concluded that her condition fully precludes working full time as she would reasonably have to miss more than four working days a month, if not many more, and because she is very limited in how long she can stand or sit in one place due to chronic muscle fatigue, chronic back and neck problems, migraine headaches, and the overall fatigue and weakness associated with electrolytic abnormalities. (Tr. 229.) Dr. Jakacki further found that Brown would have to take frequent unscheduled bathroom breaks, possibly every twenty to thirty minutes, because of her interstitial cystitis and diarrhea, requiring her to be missing from her station. (Tr. 230.)

In addition to the above letters, Dr. Jakacki also completed a "Physical Residual Functional Capacity Questionnaire" on June 9, 2009. (Tr. 151-54.) He reported that he had

treated Brown since January 2005 and listed her symptoms as weakness, fatigue, muscle spasms, spasms in the neck, paresthesis of the hands, increased urinary frequency up to twenty to thirty minutes (even at night), and diarrhea. (Tr. 152.) Dr. Jakacki found that Brown's depression and anxiety affected her physical condition and that her symptoms were severe enough to interfere with the attention and concentration needed to perform even simple repetitive tasks, requiring breaks of ten to fifteen minutes four to five times a day. (Tr. 152.) In terms of physical tasks, Dr. Jakacki stated that Brown could lift ten pounds frequently and twenty pounds rarely, could sit about twenty minutes at a time and four hours total in an eight-hour workday, and could stand/walk about thirty minutes at a time and less than two hours out of eight. (Tr. 153-54.) He wrote that Brown would also require a sit/stand option at will and unscheduled breaks every thirty to forty minutes for five to ten minutes. (Tr. 153-54.) He further concluded that she could only work part time (six hours per day) because of frequent urination, fatigue, muscle cramps, anxiety, and weakness (Tr. 153) and that she would miss more than four days of work a month due to her medical condition and treatment (Tr. 154). As regards the length of Brown's symptoms and limitations, Dr. Jakacki opined that Brown's condition had grown more incapacitating with age and became significantly worse during pregnancy. (Tr. 154.)

2. *Other Medical Opinions*[4]

On January 29, 2007, Dr. Sherwin Kepes, Ph.D, a consulting psychologist, examined Brown, who informed him that her kidney disease resulted in muscle spasms, weakness, neck pain, dizziness, and headaches. (Tr. 365.) Brown also stated that she did housework, cooked,

---

[4]While there are other medical opinions in the record from state agency physicians (*see* Tr. 448, 234), as the ALJ attached "no weight" to their opinion that Brown's Gitelman's Syndrome was "nonsevere" (Tr. 25), they are not recounted here.

tended to her personal care, went to movies, did sign language, saw friends, and had worked for about eight months as a waitress at a restaurant until she left for medical reasons. (Tr. 365.) Dr. Kepes observed that Brown had difficulty with math problems in mental or story form, but concluded that there was no evidence to suggest that Brown had significant depression or anxiety, provisionally diagnosed her with rule out mathematics disorder, and assigned her a GAF score of 75.[5] (Tr. 366-68.)

On April 2, 2008, nephrologist Dr. Andrew O'Shaughnessy saw Brown and diagnosed her with probable Gitelman's Syndrome. (Tr. 201-02.) Dr. O'Shaughnessy indicated that "[i]t sounds like she does actually tolerate the low potassium and magnesium fairly well, although certainly [her] pregnancy is going to make this somewhat more difficult, particularly if she has marked emesis (vomiting)." (Tr. 202.)

### 3. Brown's Emergency Room Visits and Hospitalizations

Plaintiff's Opening Brief contains a chart of Brown's emergency room visits and hospitalizations from October 2005 to May 2009.[6] (See Pl.'s Br. 6-9.) According to this chart, from October 10, 2005, to May 20, 2009, Brown visited the emergency room or was hospitalized a total of 87 times, 50 of which were for infusions of potassium and magnesium. (See Tr. 157-

---

[5]Global Assessment of Functioning ("GAF") scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A score of 71 to 80 means that, "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument)" and indicates "no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork." Id. at 34.

[6]The chart is based primarily, but not entirely, on the chart provided by William Harris, Brown's representative before the Social Security Administration. (Pl.'s Br. 6 n.1.) The Commissioner largely agrees with the chart provided in Plaintiff's Opening Brief, but provided additional information and additional record cites in his Response where necessary. (Memo. in Supp. of Comm'r's Decision ("Comm'r's Resp.") 3 n.1.) In the interests of brevity, rather than reproducing the charts, the Court summarizes the entries.

61; Pl.'s Br. 6-9.)  None of these infusions occurred in 2005.[7]  (*See* Tr. 157-61; Pl.'s Br. 6-9.)  In 2006, Brown had six infusions, including one overnight stay.  (*See* Tr. 160-61; Pl.'s Br. 6-7.)  The following year, Brown received infusions eight times, two of which required overnight hospitalization.  (*See* Tr. 160; Pl.'s Br. 7.)

In December 2007, Brown found out that she was pregnant with her first child (Tr. 207) and gave birth to her daughter on August 22, 2008 (Tr. 158).  From January 2008 to the birth of Brown's daughter on August 22, 2008 (Tr. 158), Brown had infusions at least 31 times, 5 of which necessitated hospitalization overnight.[8]  (*See* Tr. 157-60; Pl.'s Br. 7-8.)  After her daughter was born, Brown received three infusions in September, none overnight, and then no infusions for the rest of 2008.  (*See* Tr. 157; Pl.'s Br. 8.)

For the five months reported in 2009, Brown had just two infusions, none of which required her to be admitted overnight.  (*See* Tr. 157; Pl.'s Br. 8-9.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

---

[7]On October 10, 2005, Brown was admitted for "hypokalemia" and "hypomagnesemia."  (Tr. 161; Pl.'s Br. 6.)  Because it is unclear whether Brown received infusions during this admission, it is not included in the calculation.

[8]The entry on the chart for May 27, 2008, to May 28, 2008, states only "Admit" and does not indicate if Brown was admitted for infusion or something else.  (Tr. 159; Pl.'s Br. 8.)  If Brown was admitted for infusions, then Brown would have been hospitalized 32 times for infusions and would have stayed overnight for infusions six times.

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[9] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On April 23, 2010, the ALJ rendered his decision. (Tr. 17-28.) At step one of the analysis, the ALJ found that Brown had failed to establish that she did not engage in SGA since October 26, 2006, the date the SSI application was filed. (Tr. 19.) Specifically, the ALJ noted that Brown had worked during 2007 as a waitress or cashier, earning a total of $9,365.07. (Tr. 20.) Although, if apportioned over the entire twelve month period, this would be slightly under the $900 per month threshold for SGA in 2007, the ALJ found that the record did not demonstrate, and that Brown had not established, that this income was paid for work performed for the entire period of 2007. (Tr. 20.) Therefore, the ALJ concluded that Brown failed to establish that this income was not SGA for *some* portion of the 2007 calendar year. (Tr. 20.)

At step two, the ALJ concluded that Brown had a severe impairment. (Tr. 20.)

---

[9] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Nonetheless, at step three, the ALJ determined that Brown's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 20-22.) Before proceeding to step four, the ALJ assigned Brown the following RFC:

> [T]he claimant is not able to perform work that imposes close regimentation of production. . . . Evidence supports a finding that the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. She would require the option to sit and stand while working. Relevant impairments would prevent standing and walking more than 75 percent of the 8-hour workday, and no more than 30 minutes at a time. The claimant would require hourly restroom breaks for 3 to 5 minutes.

(Tr. 22.) In reaching this RFC, the ALJ determined that Brown was reliable in her testimony that her Gitelman's Syndrome causes frequent urination, nausea, and fatigue and that these symptoms were corroborated by the host of medications, vitamin shots, mineral pills, and infusions she takes. (Tr. 24.) According to the ALJ, these treatments support the RFC findings above, but Brown failed to established greater restrictions. (Tr. 24.) While Dr. Jakacki, Brown's treating physician, gave "a more sympathetic assessment, stating that she could not maintain the attendance requirements of full-time work," the ALJ concluded that an examination of the full record did not support this degree of disability. (Tr. 24.)

In particular, while noting that many of the limitations given by Dr. Jakacki are consistent with the RFC, the ALJ rejected Dr. Jakacki's opinions that Brown cannot work more than six hours a day, would be absent more than four days per month, and cannot sustain work because these limitations conflicted with the evidence of Brown's history of having a nearly full-time work schedule as a night shift waitress or cashier in 2007 and her current activities, such as caring for a young child while also pregnant, performing housekeeping chores, and taking multiple college classes online. (Tr. 25.) Additionally, the ALJ found that the medical record of Brown's hospital visits does not support a finding that she would be absent at a rate that would

preclude competitive work.  (Tr. 25.)

Moving onto step four, the ALJ found that Brown was unable to perform any past relevant work.  At step five, however, the ALJ determined that Brown could perform a significant number of jobs within the economy, including laundry folder, mail clerk, and collateral operator.  (Tr. 27.)  Therefore, Brown's claims for DIB and SSI were denied.  (Tr. 27.)

### C.  The ALJ's Consideration of Dr. Jakacki's Opinion Is Supported by Substantial Evidence and Did Not Contain Legal Error

Brown argues that the ALJ improperly evaluated the opinion of Dr. Jakacki, Brown's treating physician, namely his conclusions that Brown could only work part time, or six hours a day, and would miss more than four days a month due to her medical condition and treatment. Specifically, Brown asserts that the ALJ improperly considered her prior work history, too casually equated household work to work in the labor market, failed to consider Brown's other problems that caused absenteeism, and committed legal error by not explicitly addressing the checklist factors in discounting Dr. Jakacki's opinions.  (Opening Br. 13-15.)  None of Brown's arguments, however, warrant a remand of the Commissioner's decision.

While the Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and  circumstances," *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), this principle is not absolute.  Accordingly, "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Seventh Circuit has further

recognized a treating physician's potential bias, stating, "[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books*, 91 F.3d at 979. The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover, "an ALJ must articulate, at some minimum level, [his] analysis of the evidence. [He] is not required to address every piece of evidence or testimony, but must provide some glimpse into his reasoning," thereby creating "an accurate and logical bridge between the evidence and the result" and allowing the court "to trace the ALJ's path of reasoning." *Vincent v. Astrue*, 752 F. Supp. 2d 914, 925 (N.D. Ind. 2010) (internal quotation marks and citations omitted).

Here, the ALJ adopted most of Dr. Jakacki's functional assessments of Brown's limitations in the RFC, such as Brown's inability to stand or walk for prolonged periods of time, her need for frequent restroom breaks, and her incapability to do work entailing close

regimentation of production or strict supervision. (Tr. 25.) The ALJ rejected the following: Dr. Jakacki's conclusions that Brown could work no more than six hours a day, that Brown would be absent more than four days per month, and that Brown could not sustain work. (Tr. 24-25.) In rejecting these opinions, the ALJ focused on the how these conclusions were inconsistent with the record as a whole, specifically Brown's history of having a nearly full-time work schedule in 2007, her current activities, including taking care of her child while pregnant, housekeeping chores, and meeting the demands of taking multiple college courses online, and the medical records of her hospital visits. (Tr. 25.)

Before delving into Brown's specific grievances with the ALJ's decision, an overall analysis of the ALJ's discounting of Dr. Jakacki's opinions about Brown's inability to meet the requirements of full-time work is instructive. Ultimately, the ALJ rejected Dr. Jakacki's opinion that Brown cannot sustain work, giving it no significant weight. (Tr. 25.) A claimant, however, is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818 (N.D. Ill. 2006); 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3). Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 819. "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. [§§] 404.1527(d)

and 416.927(d)."  SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 819.

In giving no significant weight to Dr. Jakacki's opinion that Brown could not sustain work, the ALJ did not simply rely on the fact that this was an issue reserved to the Commissioner; rather, the ALJ stated that the records do not support a finding that Brown's absences would exceed an average of one day per month on a sustained basis, which required the ALJ to discount Dr. Jakacki's opinion that Brown would be absent at a rate that would preclude competitive work.  (Tr. 25.)  While Dr. Jakacki reported that Brown would likely be absent more than four days per month (Tr. 154), the ALJ found this opinion to be inconsistent with the medical records of Brown's hospital visits and Dr. Jakacki's own observations.  (*See* Tr. 25.) Internal inconsistencies as well as inconsistencies with other evidence in the record may provide good cause to deny controlling weight to a treating physician's opinion provided the ALJ adequately articulates his reasoning for discounting the treating physician's opinion.  *Clifford*, 227 F.3d at 871.

Here, the ALJ discounted Dr. Jakacki's opinion regarding Brown's probable absenteeism by conducting an examination of Brown's hospital records for infusions[10] and finding that the majority of Brown's admissions to the hospital for infusions—as the ALJ calculated it, 32 out of the 47 infusions in the 31-month period between October 26, 2006, and May 20, 2009—were concentrated in 2008, when she was pregnant, and that these admissions dropped off considerably once Brown gave birth on August 22, 2008.  (Tr. 25.)  Specifically, the ALJ noted that from October 26, 2006, through the end of 2006, Brown had two outpatient infusions; in

---

[10]The ALJ relied on the summary chart of Brown's hospital visits provided by her counsel in front of the Social Security Administration and contained on pages 157 through 161 of the Transcript.  This chart differs from the one in Brown's Opening Brief slightly; the chart in Brown's Opening Brief adds three visits to the Dupont ER and a hospitalization at St. Joe.  (Opening Br. 6 n.1.)

2007, she had eight infusions, with one requiring an overnight hospital stay.  (Tr. 25.)  From

January 2008 through August 2008, however, when Brown was pregnant, she had 32 infusions, 5

of which necessitated overnight stays.  (Tr. 25.)  The ALJ further pointed out that, after Brown

gave birth, she had just 3 infusions in September 2008, but none for the rest of the year, and only

2 infusions for the first five reported months of 2009.  (Tr. 25.)  The ALJ concluded that "this

pattern is consistent with Dr. Jakacki's observation that Brown's need for infusions increased

significantly while she was pregnant and because she was pregnant" and that, therefore, it is

"reasonable to conclude that the rates of hospitalization the claimant had in 2006, 2007, and

2009 are more reflective of her baseline condition."  (Tr. 25.)  Using 2006, 2007, and 2009 as a

baseline for her hospitalization and infusion rates, the ALJ then concluded that the records do not

support a finding that Brown's absences would exceed an average of one day per month on a

sustained basis.  (Tr. 25.)  Therefore, this is not a case where the ALJ simply assigned little or no

weight to a treating physician's opinion without any explanation.  *See Clifford*, 227 F.3d at 870.

Rather, the ALJ concluded that Dr. Jakacki's opinion was inconsistent with other evidence and

*explained that inconsistency* by pointing to specific medical evidence, thereby creating "an

accurate and logical bridge between the evidence and the result" and allowing the court "to trace

the ALJ's path of reasoning."  *Vincent*, 752 F. Supp. 2d at 925.

Turning to Brown's specific challenges, Brown first argues that the ALJ misconstrued

her past work history because she worked only 24 to 25 hours per week, which was not a "nearly

full-time work schedule" as the ALJ asserted, and because she was accommodated by her

employers and working beyond her capacity.  (Opening Br. 13.)  The Commissioner responds

that the record as a whole and Brown's own testimony shows that she worked an average of 25

to 28 hours a week. (Resp. 15.) Brown's attempt to nitpick the ALJ's decision, however, is unconvincing. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). Regardless of whether 24 or 25 to 28 hours per week is a nearly full-time schedule, it is still a substantial amount of work. Importantly, the ALJ did not consider Brown's prior work history in a vacuum, but rather in combination with her daily activities, the medical evidence, and the testimony at the hearing, which are all appropriate for an ALJ to consider when evaluating possible inconsistencies in the record. *See Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (relying on the claimant's prior work and wage earning history as well as the objective medical evidence, the claimant's daily activities, and testimony evidence to conclude that the claimant's subjective complaints and functional limitations were inconsistent with the record as a whole).

Brown's work history was just one factor that went into the ALJ's rejection of Dr. Jakacki's opinion that Brown could not meet the requirements of full-time employment. As such, any purported error in the ALJ's equation of Brown's prior employment to a nearly full-time schedule is ultimately harmless because the ALJ did not base his conclusion that Dr. Jakacki's opinion was inconsistent with the record as a whole solely on Brown's previous work history, but relied on other inconsistent evidence as well. *See Skarbek v. Barnhart*, 390 F.3d 500, 5004 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case"). Moreover, this is not a case where the ALJ merely "select[ed] and discuss[ed] only that evidence that favors his ultimate conclusion," *Herron v. Shadala*, 19 F.3d 329, 333 (7th Cir. 1994), because the ALJ acknowledged that Brown was accommodated in her

earlier employment by being allowed to sit at a stool and take restroom breaks.  (Tr. 23-25.)  As this Court will not nitpick the ALJ's decision, no remand is warranted on the basis of the ALJ's possible misconstruing of Brown's work history, particularly because this was just one factor in the ALJ's determination.

Next, Brown asserts that the ALJ too casually equated her daily activities of childcare, housekeeping chores, and online college courses to work activity in discounting Dr. Jakacki's opinions that she could only work part time and would be absent more than four days a month. (Opening Br. 13-14.)  While the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," assigning some weight to such activities is appropriate.  *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).  For example, in *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005), the Seventh Circuit found that the ALJ too casually equated the claimant's ability to do housework and take care of her children to work in the labor market, failing to take into account the degree of flexibility in housework and childcare that is absent from the workplace.  On the other hand, in *Begley v. Astrue*, No. 1:10-cv-01113-SEB-TAB, 2011 WL 3739339, at *3 (S.D. Ind. Aug. 23, 2011), the ALJ relied partly on the claimant's activities in daily living to conclude that he could perform full-time work, and the district court affirmed such reliance, distinguishing Begley from Gentle.  Specifically, the court noted that

> Mr. Begley can "lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently," and he can stand, sit, or, ambulate for six hours per day.  By comparison, Ms. Gentle was unable to lift more than ten pounds frequently, and she could not bend or turn.  Importantly, Ms. Gentle cared for two children and presented credible evidence of a medical need to rest two hours during each work day . . . .

*Id.*  Along with these differences in limitations, in upholding the ALJ's decision, the district

court also relied on the fact that the ALJ did not confine his disability determination to Begley's activities of daily living, but conducted a thorough review of medical evidence, medications, and aggravating factors in assessing his impairments. *Id.*

Here, Brown's situation and the ALJ's analysis of her limitations more closely resembles *Begley* than *Gentle*. Like Begley, the ALJ found that Brown could lift ten pounds frequently and twenty pounds occasionally, along with requiring an option to sit and stand while working. (Tr. 22.) Unlike Gentle, Brown was able to bend or turn occasionally. (Tr. 154.) In Brown's case, her established medical need was not that of rest like Gentle, but hourly restroom breaks, which were incorporated into the ALJ's RFC. (Tr. 22.) As far as Brown's ability to take care of her daughter, the ALJ did acknowledge that, according to Brown's grandmother, Brown had help taking care of her. (Tr. 23.) Additionally, like in *Begley*, the ALJ did not confine his disability determination to Brown's activities of daily living, but conducted a thorough review of Brown's medical evidence, including Dr. Jakacki's medical source statements and Brown's hospital records, her medications—including Brown's own testimony on the subject which the ALJ found Dr. Jakacki corroborated—Brown's previous work history, and the testimony of Brown's grandmother. Therefore, once again, the ALJ did not merely "select and discuss only that evidence that favors his ultimate conclusion," *Herron*, 19 F.3d at 333, but weighed all the relevant evidence and articulated his reasons for rejecting Dr. Jakacki's conclusion that Brown could only work part time and would be absent at a rate preclusive of competitive work, *see Clifford*, 227 F.3d at 870.

In regards to the ALJ's consideration of Brown's probable absenteeism, Brown argues that although the hospitalizations and emergency room visits alone may not add up to missing

four days of work per month, she had other problems—including chronic muscle tension and neck problems, electrolytic disturbances, hormonal fluctuations, stress, interstitial cystitis, diarrhea, fecal urgency, and major depression with anxiety—that caused absenteeism that the ALJ failed to consider. (Opening Br. 14.) Brown, however, fails to cite any treatment records or other medical evidence showing that she missed work due to these impairments. At step three, Brown, and not the Commissioner, "bears the burden of proving that she is disabled, and she failed to present any medical evidence linking [these other ailments] to the unacceptable level of absenteeism she alleges." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a)) (dealing with chronic fatigue syndrome). Therefore, the ALJ's failure to consider a seemingly unsupported link between absenteeism and Brown's other ailments does not warrant a remand.

Finally, Brown asserts that the ALJ committed legal error at step three by not explicitly addressing the checklist of factors under 20 CFR §§ 404.1527(d)(2) and 416.927(d)(2)[11] in considering the opinion of Dr. Jakacki, Brown's treating physician. (Opening Br. 14-15.) "It is true that [20 C.F.R. § 404.1527(d)(2)] requires the ALJ to consider those six factors, but his decision need only include 'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. Mar. 16, 2011)); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an

_____

[11]These factors are, once again, (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.

ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is no "*articulation* requirement for each and every factor" and that "ALJs are not required to produce prolix opinions containing checklists from all of the regulations" (emphasis in original)). Moreover, as the Commissioner has recognized, "[n]ot every factor for weighing opinion evidence will apply in every case." SSR 06-03p. "Rather, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning." *Brown*, 298 F. Supp. 2d at 792. Therefore, it is enough if the ALJ generally covers the ground of 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) and provides "good reasons" for the weight assigned to the treating physician's opinion. *See Hanson*, 2011 WL 1356946, at *12; *accord Oldham*, 509 F.3d at 1258 (noting that the ALJ provided good reasons for the weight he gave to the treating sources' opinion and concluding that "[n]othing more was required in this case").

Here, while the ALJ does not explicitly apply every checklist factor in the section in which he rejects Dr. Jakacki's opinions that Brown can only work part time, would miss more than four days of work per month, and cannot sustain work, the ALJ does consider several of these factors elsewhere in his opinion. For instance, the ALJ recognizes the nature and extent of the treatment relationship, referring to Dr. Jakacki as Brown's primary care and treating physician (Tr. 21, 24), and acknowledges Dr. Jakacki as a family practitioner, implicitly addressing whether Dr. Jakacki is a specialist (Tr. 24). Moreover, while the ALJ does not mention the specific length of Dr. Jakacki's treatment relationship with Brown, the ALJ does reiterate Dr. Jakacki's statements in his January 2008 letter that Brown's condition necessitated

office visits at least monthly, which speaks to the frequency of examination. (Tr. 24.) In terms of the amount of supporting evidence, the ALJ goes into detail concerning Dr. Jakacki's January 2008 and June 2009 letters, his RFC questionnaire, and his opinions concerning Brown's limitations, many of which the ALJ adopts in his RFC. (Tr. 24.) When actually rejecting the portions of Dr. Jakacki's opinion regarding Brown's inability to work full time and her probable absenteeism, the ALJ focuses primarily on the consistency, or lack thereof, between this opinion and the record as a whole. (*See* Tr. 25.) Thus, the ALJ generally covered the ground of the checklist factors, and, more importantly, as explained above, sufficiently articulated his assessment of the evidence in the record in a traceable manner. *See Brown*, 298 F. Supp. 2d at 792.

Notably, this is not a case where the ALJ rejected a treating physician's opinion in favor of a consulting physician's opinion. *See Books*, 91 F.3d at 979-80. In that kind of case, an ALJ would commit legal error if he gave more weight to consultative opinions over that of a treating physician without adequately explaining why and saying nothing about the checklist of factors. *See Campbell v. Astrue*, 627 F.3d 299, 308-09 (7th Cir. 2010). Instead, here, besides considering Dr. Kepes's evaluation of Brown's mental health (Tr. 21-22), the ALJ did not give any weight to any other medical opinion but Dr. Jakacki's. While the ALJ noted the state agency physicians' conclusion that Brown's Gitelman's Syndrome was "nonsevere," he *rejected that conclusion*, giving it no significant weight, in light of the inconsistency between this conclusion and the medical evidence of Brown's extensive treatment, most of which came from Dr. Jakacki. (Tr. 25.) After a careful analysis of the record as a whole, including an at least implicit consideration of the checklist factors, the ALJ rejected Dr. Jakacki's opinions regarding Brown's inability to

work full time and her probable absenteeism, citing to specific inconsistent evidence and providing a traceable articulation of his logic. This is enough to avoid a remand.

### D. The ALJ's Credibility Determination Should Not Be Disturbed

Next, Brown argues that the ALJ improperly evaluated her symptom testimony. Brown's credibility argument is only two sentences, boiling down to the vague and unsupported assertion that "[t]he ALJ discredited [Brown's] symptom testimony for the same reasons he discounted the weight of the opinion of her treating doctor." (Opening Br. 15.) The Seventh Circuit "repeatedly ha[s] made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000); *see Clarett v. Roberts*, No. 09-2805, 2011 WL 4424790, at *8 (7th Cir. Sept. 23, 2011); *Gross v. Town of Cicero*, 619 F.3d 697, 704-05 (7th Cir. 2010); *United States v. Tockes*, 530 F.3d 628, 633 (7th Cir. 2008) ("Unsupported and undeveloped arguments . . . are considered waived."); *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." (quotation marks omitted)). Nonetheless, the Court will briefly address this argument and find it, once again, wanting.

"Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain." *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998) (citations omitted); *see Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (that is, an impairment that can be shown by medically acceptable clinical and

laboratory diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see Herron*, 19 F.3d at 334; *Williams*, 915 F. Supp. at 964; 20 C.F.R. §§ 404.1529(c), 416.929(c). "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p. In making this finding, the ALJ must consider various factors in addition to the objective medical evidence, including the claimant's daily living activities; the location, duration, frequency, and intensity of her pain; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness, and side effects of any pain medication; treatment, other than medication, that the claimant receives for pain; any other measures that she uses to relieve pain; and any other factors concerning the claimant's functional limitations and restrictions due to pain. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ concluded that the record shows that Brown has Gitelman's Syndrome and that "[Brown] was reliable in her testimony that this impairment causes her to experience frequency of urination, nausea and fatigue." (Tr. 24.) The ALJ further found that these symptoms were corroborated by the array of medications, vitamin shots, mineral pills, and infusions she takes, which he described in detail when recounting Brown's testimony, her grandmother's testimony, and Dr. Jakacki's medical source statements. (Tr. 23-24.) Ultimately, the ALJ determined that these treatments supported the RFC he had assigned, but that Brown had not established greater restrictions. (Tr. 24.) In reaching this conclusion, the ALJ relied on the factors in 20 C.F.R. §§ 404.1529(c), 416.929(c), and SSR 96-7p, including Brown's daily activities, like caring for her child and taking online college classes, the effectiveness of her medications and supplements and their side effects, such as increased urination, diarrhea, nausea, and fatigue, as well as the infusions she receives for Gitelman's Syndrome, just to name a few. (Tr. 21-25.) Therefore, based on this record and Brown's perfunctory and wholly undeveloped argument, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, is not patently wrong and, thus, should not be disturbed.

27

*E. The ALJ's Substantial Gainful Activity Determination Did Not Affect the Outcome*

Finally, Brown argues that the ALJ failed to properly evaluate whether Brown engaged in SGA. (Opening Br. 15-16.) The ALJ noted that Brown earned a total of $9,365.07 in 2007 and that, while this would not be SGA if apportioned over the entire year, Brown had failed to show that this income was not SGA for some portion of 2007. (Tr. 20.) Specifically, Brown asserts that, at the worst, she would be ineligible through the end of 2007 and that ALJ did not consider that she may have engaged in subsidized work during 2007. (Opening Br. 16.) Brown's arguments, however, are unpersuasive.

First, it was *Brown*, and not the Commissioner, who bore the ultimate burden of proving that she was not engaged in SGA. *See Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n.3 (7th Cir. 1999); *Callaghan v. Shalala*, 992 F.2d 692, 696 (7th Cir. 1993). Brown has failed to meet that burden. Moreover, even if the ALJ erred in determining that Brown was engaged in SGA, he did not stop at his step one determination, but rather continued the sequential analysis, reaching steps two through five.

When the ALJ continues on in the sequential evaluation to reach an alternative finding, despite a determination that could end the analysis earlier on, courts have deemed an error by the ALJ at the earlier step to be harmless. *See Ziegler v. Astrue*, 336 F. App'x 563, 570-71 (7th Cir. 2009) (unpublished) (finding harmless ALJ's factually unsupported determination at Step 4 that claimant could not perform past work where ALJ made alternative finding at Step 5 that claimant could perform other jobs that exist in significant numbers); *Pfund v. Astrue*, No. 10-C-1145, 2011 WL 3844155, at *14 n.42 (E.D. Wis. Aug. 26, 2011) (noting that where "the claimant alleges a step two error in finding certain impairments non-severe, the error may be deemed

harmless if the ALJ proceeded with the sequential evaluation process and accounted for all limitations supported by the evidence in setting RFC"); *Tadros v. Astrue*, No. 10 C 7074, 2011 WL 3022302, at *15 (N.D. Ill. July 22, 2011) (holding that the ALJ's error at Step 4 was harmless because he continued on in the sequential analysis and his alternative finding at Step 5 was sufficient to substantiate his determination that the claimant was not disabled); *Cadenhead v. Astrue*, No. 05 C 3929, 2010 WL 5846326, at *13 (N.D. Ill. Mar. 5, 2010) (finding that an argument that the ALJ erred in revisiting whether the claimant engaged in SGA on remand was "of no consequence, because the ALJ went forward in the sequential evaluation and made alternate findings that [the claimant] was not disabled at steps two and four").

Here, despite finding that Brown failed to meet her burden of establishing that she did not engage in SGA for some portion of 2007, the ALJ still continued onto the next steps in the sequential analysis, ultimately concluding that Brown was not disabled. Therefore, any error at step one concerning SGA is harmless and does not warrant a remand. *See Cadenhead*, 2010 WL 5846326, at *13.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Brown.

SO ORDERED.

Enter for this 27th day of October, 2011.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge